IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. _____

MINOR GGM , a minor, by and through her parents and next friends, CHRIS GAYNOR-MAIORIELLO  and BRANDY GAYNOR-MAIORIELLO ; and CHRIS GAYNOR-MAIORIELLO  and BRANDY GAYNOR-MAIORIELLO , individually,

  Plaintiffs,


v.

THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate, on behalf of the University of Colorado School of Medicine; GREGORY BRAMES, M.D., in his individual capacity and in his official capacity as an employee of the University of Colorado School of Medicine; KATHRYN CHATFIELD, M.D., Ph.D., in her individual capacity and in her official capacity as an employee of the University of Colorado School of Medicine; GARETH JOHN MORGAN, M.D., in his individual capacity and in his official capacity as an employee of the University of Colorado School of Medicine; JAMES JAGGERS, M.D., in his individual capacity and in his official capacity as an employee of the University of Colorado School of Medicine; and JOHN/JANE DOES 1-10,

  Defendants.


**COMPLAINT AND JURY DEMAND**

Plaintiffs, by and through undersigned counsel, for their Complaint against Defendants, state and

allege as follows:

**INTRODUCTION**

1. This civil action arises from an unauthorized, ultra-high-risk cardiac intervention

    performed on a minor child, Minor GGM , in a catheterization laboratory at Children's

    Hospital Colorado in Aurora, Colorado, without her parents' informed, written consent to

    the materially altered setting, resources, personnel, timing, and risk profile. The decision

    to proceed in the cath lab, despite the unavailability of an ordinary operating room and

    immediate surgical conversion capability, resulted in pulmonary artery rupture, massive

1

hemorrhage, cardiac arrest, hypoxic-ischemic encephalopathy, and permanent neurological devastation.

2. State-employed physicians of the University of Colorado School of Medicine, acting under color of state law, deprived Plaintiffs of clearly established constitutional rights, including procedural and substantive due process, equal protection, and the Parents' right to familial association and medical decision-making for their minor child, and discriminated against Minor GGM in violation of Title II of the ADA and § 504 of the Rehabilitation Act.

3. Plaintiffs further assert state-law claims, including medical battery/unauthorized procedure, lack of informed consent, professional negligence/medical malpractice, negligent hiring/training/supervision/retention, negligent misrepresentation by omission, fraudulent concealment, civil conspiracy, intentional infliction of emotional distress, breach of fiduciary duty, and negligent infliction of emotional distress.

4. Plaintiffs seek compensatory, nominal, and punitive damages as permitted by law, declaratory relief, and prospective injunctive relief to remedy and prevent recurrence of the policies, practices, and omissions that caused these injuries.

**PARTIES**

5. Plaintiff Minor GGM  ("Minor GGM") is a minor child who, at all relevant times, resided with her parents in Colorado Springs, El Paso County, Colorado. Minor GGM suffered catastrophic, permanent neurological injury arising from the acts and omissions alleged herein.

6. Plaintiff Chris Gaynor-Maioriello  is Minor GGM's father and a resident of Colorado. He brings claims on his own behalf and as a next friend of Minor GGM.

2

7. Plaintiff Brandy Gaynor-Maioriello  is Minor GGM's mother and a resident of Colorado. She brings claims on her own behalf and as a next friend of Minor GGM.

8. Defendant The Regents of the University of Colorado (the "Regents") is a body corporate that governs the University of Colorado, including the University of Colorado School of Medicine. The Regents is a "public entity" under Title II of the ADA and a recipient of federal financial assistance under § 504.

9. Defendant Gregory (Greg) Brames, M.D. ("Dr. Brames") is, and at all relevant times was, a physician licensed in Colorado, employed by the University of Colorado School of Medicine in Pediatric Cardiology, and credentialed with clinical privileges at Children's Hospital Colorado ("CHCO") in Aurora. He is sued in his individual and official capacities.

10. Defendant Kathryn (Katie) Chatfield, M.D., Ph.D. ("Dr. Chatfield") is, and at all relevant times was, a physician licensed in Colorado, employed by the University of Colorado School of Medicine (Pediatric Cardiology; Clinical Genetics), and credentialed with clinical privileges at CHCO in Aurora. She is sued in her individual and official capacities.

11. Defendant Gareth John Morgan, M.D. ("Dr. Morgan") is, and at all relevant times was, a physician licensed in Colorado, employed by the University of Colorado School of Medicine (Pediatric Cardiology), and credentialed with clinical privileges at CHCO in Aurora. He is sued in his individual and official capacities.

12. Defendant James Jaggers, M.D. ("Dr. Jaggers") is, and at all relevant times was, a physician licensed in Colorado, employed by the University of Colorado School of

3

Medicine (Pediatric Cardiothoracic Surgery), and credentialed with clinical privileges at CHCO in Aurora. He is sued in his individual and official capacities.

13. Defendants John/Jane Does 1-10 are persons whose identities presently are unknown despite reasonable diligence. They include physicians, fellows, residents, advanced-practice providers, nurses, perfusionists, anesthesiology personnel, cath-lab and OR administrators/schedulers, risk-management personnel, and/or policy-makers who participated in, approved, directed, or concealed the conduct alleged herein. They are sued in their individual and, where applicable, official capacities.

## JURISDICTION AND VENUE

14. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims arising under the Constitution and laws of the United States, including 42 U.S.C. § 1983, Title II of the ADA, and § 504 of the Rehabilitation Act.

15. This Court has jurisdiction under 28 U.S.C. § 1343(a)(3)-(4) because Plaintiffs seek to redress the deprivation, under color of state law, of rights secured by the Constitution and federal civil-rights statutes.

16. The Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the federal claims.

17. Personal jurisdiction exists over all Defendants pursuant to Colorado's long-arm statute, C.R.S. § 13-1-124(1)(a)-(c), because Defendants transact business in Colorado, committed tortious acts in Colorado, and own, use, or possess property in Colorado. Exercising jurisdiction comports with due process because Defendants purposefully

4

availed themselves of this forum, and Plaintiffs' claims arise from Defendants' forum-related conduct.

18. Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District, including at Children's Hospital Colorado in Aurora.

19. At all relevant times, Defendants employed by the University of Colorado School of Medicine acted under color of state law within the meaning of 42 U.S.C. § 1983.

**NOTICE, IMMUNITIES, AND TOLLING**

20. The Colorado Governmental Immunity Act (CGIA) does not bar Plaintiffs' § 1983 claims. To the extent CGIA applies to any state-law claim, Plaintiffs plead compliance with, satisfaction of, waiver of, or tolling of any notice requirement and preserve all arguments regarding jurisdictional facts.

21. Plaintiffs invoke minority tolling and fraudulent-concealment tolling pursuant to C.R.S. §§ 13-80-108(3) and 13-80-118 and equitable doctrines. Despite diligence, the Parents did not learn that the procedure was performed in a catheterization laboratory, rather than in an operating room, until December 31, 2024.

**FACTUAL ALLEGATIONS**

22. Background and Initial Recommendations

23. Minor GGM was born with complex congenital heart disease, including multiple muscular ventricular septal defects (VSDs), and underwent pulmonary artery (PA) banding in infancy in Germany.

24. After relocating to Colorado Springs for Chris Gaynor-Maioriello 's military service, Minor GGM established pediatric cardiology care at CHCO.

5

25. Imaging and clinical evaluation identified a longstanding, tight PA band and multiple apical VSDs. The family provided the German history; the prior operative records were not available in CHCO's chart.

26. On or about October 2022, a multidisciplinary pediatric cardiology/cardiothoracic surgery conference at CHCO recommended surgical de-banding (and possible VSD management) in a fully staffed operating room (OR) with immediate surgical rescue capability due to the duration of the band and known risks of balloon de-banding longstanding bands.

**Shift to a Catheter-Based Plan**

27. In or about mid-2023, Defendants Drs. Brames and Chatfield advanced an alternative plan to attempt catheter-based balloon de-banding despite absent German operative records and the foreseeably elevated risk of PA rupture/perforation with a longstanding band.

28. Defendant Dr. Morgan participated in risk stratification, planning, and approval of the catheter-based pathway.

29. The plan contemplated right-heart catheterization with pressure measurements and balloon dilation of the PA band with "surgical standby," but without securing an ordinary OR for immediate conversion.

**Day-of-Procedure Deviations**

30. The procedure was scheduled for August 9, 2023, at CHCO. Identified operators and coverage included Drs. Brames and Chatfield (interventional cardiology), Dr. Morgan (cardiology leadership), and Dr. Jaggers (cardiothoracic surgery) among others.

6

31. On the procedure date, Defendants knew an ordinary OR was unavailable and that the attending cardiothoracic surgeon was delayed by a prior case.

32. Rather than postponing until an OR could be secured or converting to a surgical OR-based approach, Defendants elected to initiate the intervention in a catheterization laboratory that lacked OR-level sterile setup, instruments, perfusion/ECMO readiness, and the full team for immediate open surgical rescue.

33. This constituted a material change from what had been represented to the family. Defendants did not obtain renewed, informed, written consent from the Parents disclosing the venue change, OR unavailability, immediate conversion limitations, materially heightened risks, or reasonable alternatives including postponement or surgical de-banding in an OR.

34. In addition, proceeding with a high-risk, non-emergent pulmonary artery de-banding attempt in a catheterization laboratory without ordinary operating-room availability constituted an experimental use of an untested venue and method for this patient and indication. The decision to use the cath lab as the site for an ultra–high-risk intervention—despite prior internal recommendations favoring an OR-based surgical approach, the known foreseeability of catastrophic rupture, and the admitted lack of prior operative records—converted the procedure into non-therapeutic human experimentation as applied to Minor GGM, without the guardrails required for research involving human subjects.

35. No institutional review board (IRB) approval, research protocol, or federally compliant human-subjects informed-consent process was presented to or signed by the Parents for any experimental departure from standard practice, including the use of the

catheterization laboratory in lieu of an ordinary operating room. The Parents were not provided any written, signed consent specific to participation in research or any experimental procedure, and no research-specific disclosures were made.

36. Nonconsensual human medical experimentation by state actors violates the Constitution's protection of bodily integrity and substantive due process. See, e.g., Clay v. Martin (reversing dismissal of experimentation claims and recognizing federal policy and legislation addressing abuses in human experimentation); Stadt v. Univ. of Rochester (denying qualified immunity; holding that the right to be free from non-consensual governmental experimentation on one's body was clearly established); Estate of Alvarez v. Johns Hopkins Univ. (recognizing prohibition on nonconsensual human medical experiments as a customary norm and gross ethical violation); Diaz v. Hillsborough Cty. Hosp. Auth. (certifying class where physicians failed to properly obtain consent for research participation) [SRC-18, CTX-5; SRC-32, CTX-13; SRC-21, CTX-66; SRC-19, CTX-6].

37. The Parents were never told that Minor GGM would be used as a subject for an experimental application of a cath-lab venue to a foreseeably rupture-prone de-banding attempt, nor were they advised of any research purpose, research alternatives, or the right to decline research participation without penalty, and they never gave informed, written, and signed permission for any experimental procedure.

38. These facts independently and cumulatively support Plaintiffs' constitutional and common-law claims, including medical battery/unauthorized procedure, lack of informed consent, negligence, fraudulent concealment, negligent misrepresentation by omission, and civil-rights violations grounded in bodily integrity and parental decision-making.

**Intra-Procedure Catastrophe and Injury**

39. After vascular access and hemodynamic assessment in the cath lab, Defendants attempted balloon dilation of the PA band.

40. Minor GGM suffered an acute PA rupture/perforation with massive hemorrhage and cardiac arrest. Resuscitation ensued, including medications, transfusion, and emergent ECMO cannulation, within the constraints of the cath lab.

41. The absence of an ordinary OR and immediate conversion capability caused delay in definitive hemorrhage control and prolonged low-flow time, resulting in profound hypoxic-ischemic encephalopathy and global brain injury.

**Post-Procedure Course**

42. Minor GGM required prolonged pediatric cardiac intensive care and remains in a persistent disorder of consciousness with spastic quadriparesis, severe cognitive impairment, tracheostomy/ventilator dependence, G-tube dependence, and other permanent, catastrophic neurological sequelae.

43. Minor GGM's injuries require lifelong care, including therapies, equipment, home modifications, specialized transportation, and attendant care. The Parents have suffered substantial economic and non-economic losses.

**Fraudulent Concealment and Date of Discovery**

44. Following the event, Defendants failed to disclose that the intervention had been initiated and performed in a catheterization laboratory rather than in an operating room and failed to disclose the OR's unavailability and the lack of immediate conversion capability.

45. Defendants' documentation and communications omitted or obfuscated these facts. The Parents did not learn the procedure was performed in a cath lab until December 31, 2024.

46. Defendants' concealment prevented timely discovery of the true facts and supports statutory and equitable tolling.

**Systemic Policies and Failures**

47. The Regents, through the School of Medicine, maintained policies, customs, and practices that were moving forces behind the harms alleged, including inadequate informed-consent and re-consent protocols; tolerance for proceeding in a cath lab when an ordinary OR and immediate conversion capability were unavailable; inadequate escalation/deferral criteria; and deficient training/supervision and documentation requirements for material changes in venue/resources/personnel/risk.

**ADDITIONAL ALLEGATIONS**

48. **Fraudulent Documentation and Concealment of Facts.** The hospital's chronology document contains an entry stating that the attending physician spoke face-to-face with Minor GGM's parents on two occasions during her cannulation and stabilization in the catheter lab, and that the physician explained Minor GGM had suffered a known potential complication—rupture of her pulmonary artery—necessitating ECMO cannulation and surgical repair. Chris and Brandy unequivocally state that this exchange never occurred. At no time did the physician personally inform them of the risks, complications, or the nature of the procedure performed in the catheter lab. The Parents were not apprised of the increased risks associated with the catheter lab setting, were not given a comprehensive list of potential complications, and were not asked to sign a consent form detailing such risks.

49. **Failure to Disclose Risks and Misrepresentation of Necessity.** The attending physician failed to inform Chris and Brandy of the specific risks inherent in the procedure,

including the heightened risk of arterial perforation due to the catheter lab environment. Instead, the physician represented the procedure as essential and of the lowest risk, despite expert analysis indicating that the procedure was not medically necessary and could have been performed more safely in a proper operating room. The Parents relied on these representations, which were later contradicted by medical experts and by the absence of informed, written, and signed consent reflecting these heightened risks.

50. **Intentional Concealment and Constitutional Deprivation.** The conduct described above constitutes intentional concealment of material facts and fraudulent misrepresentation. By failing to obtain informed, written, and signed consent; misrepresenting the necessity and safety of proceeding in a catheter lab; and subsequently attempting to cover up the true circumstances of Minor GGM's injuries through false documentation and misleading statements, Defendants deprived Minor GGM and her Parents of their constitutional rights to bodily integrity and to parental medical decision-making without due process of law. These allegations further support and augment Plaintiffs' claims for fraudulent concealment, negligent misrepresentation by omission, lack of informed consent, medical battery/unauthorized medical procedure, and civil-rights violations under 42 U.S.C. § 1983.

51. **Retaliation—Fabricated Accusations Against Father (August 16, 2023).** On the afternoon of August 16, 2023, while Minor GGM remained critically ill following the catastrophic outcome of Defendants' cardiac intervention, Plaintiff Chris Gaynor-Maioriello  held and attempted to soothe his infant daughter, Gabriella, in the hospital room while Plaintiff Brandy Gaynor-Maioriello  remained at Minor GGM's bedside. As he went to sit down, Mr. Gaynor-Maioriello  accidentally struck nearby medical

equipment, causing a loud noise. In reaction to the sudden impact, he uttered a brief profanity under his breath that was not directed toward any person or child. He did not shake, strike, or aggressively handle Gabriella and did not verbally abuse her.

52. **Knowingly False Reports by Hospital Staff.** A nurse thereafter made false allegations that Mr. Gaynor-Maioriello had aggressively bounced Gabriella on his knee and had verbally abused her, including falsely attributing to him derogatory statements about the infant. These allegations were untrue.

53. **Nonconsensual Seizure and Examination of Infant.** Without obtaining the consent of either parent and without any emergent medical necessity, the nurse removed Gabriella from Mr. Gaynor-Maioriello 's custody. Hospital personnel thereafter represented to law-enforcement officers that Gabriella had been examined by a physician and "cleared," despite the absence of parental consent for any such examination and without informing the Parents of the basis, scope, or necessity of that evaluation.

54. **No Contemporaneous Investigation by Administration.** No hospital administrator or supervisor conducted a contemporaneous investigation of the accusations. No effort was made to interview Mr. Gaynor-Maioriello or Ms. Gaynor-MMaioriello regarding the alleged incident, to corroborate the accusations with other witnesses, or to review available objective evidence. A night nurse subsequently disassociated herself from the allegations and excused herself from the situation after acknowledging that the accusations against Mr. Gaynor-Maioriello  were false and that she never felt threatened.

55. **Uncorroborated Law-Enforcement Referral and Reliance on Bias.** Later that evening, hospital personnel contacted the Aurora Police Department. According to the responding officer's report, the allegations were relayed second-hand by hospital staff

and were not independently observed by law enforcement. Responding officers expressed uncertainty as to whether the alleged statements constituted threats and did not themselves witness threatening behavior. Hospital staff further asserted that they were "afraid" of Mr. Gaynor-Maioriello  based in part on his military status and generalized references to his military background, despite the absence of any violent conduct, direct threats, or prior incidents, and despite his cooperative demeanor.

56. **Exclusion from Hospital and Interference with Parental Rights.** As a result of these false and uninvestigated allegations, Mr. Gaynor-Maioriello  was escorted from the hospital during the night and banned from the premises while Minor GGM remained critically ill. This exclusion deprived him of access to his hospitalized child, interfered with his parental rights and ability to participate in medical decision-making, and caused severe emotional distress to both Mr. and Ms. Gaynor-Maioriello .

57. **Temporal Proximity and Retaliatory Motive.** The allegations, removal, and hospital ban occurred shortly after Mr. Gaynor-Maioriello  expressed intent to pursue legal action related to Minor GGM's injuries, supporting a reasonable inference that the accusations and subsequent actions were retaliatory and intended to intimidate, silence, or discredit him.

58. **Dismissal of Criminal Matter.** The criminal matter arising from these allegations was subsequently dismissed with prejudice. When Mr. Gaynor-Maioriello  appeared in court, the case was not even placed on the docket, and no prosecution proceeded, confirming the absence of evidentiary support for the accusations. Recordings and other evidence in Plaintiffs' possession further contradict the allegations and demonstrate that they were false or materially exaggerated.

59. **Pattern of Retaliation, Concealment, and Constitutional Injury.** Defendants' conduct in fabricating allegations, seizing an infant without parental consent, summoning law enforcement without investigation, and excluding a parent from the hospital constitutes an abuse of institutional authority and forms part of a broader pattern of retaliation, concealment, and interference with Plaintiffs' constitutional rights following Minor GGM's catastrophic injury.

**COUNT I 42 U.S.C. § 1983 - Procedural Due Process (Fourteenth Amendment)**
**(Against All Individual Defendants; Monell Liability Against the Regents)**

60. Plaintiffs incorporate by reference Paragraphs 1-41.

61. Plaintiffs possess protected liberty interests in bodily integrity (Minor GGM) and in the Parents' fundamental right to make medical decisions for their minor child, including informed, written consent before invasive procedures and before any material change in the procedure's nature, venue, resources, personnel, timing, or risk profile.

62. Acting under color of state law, Defendants deprived Plaintiffs of these interests without constitutionally adequate process by initiating and performing an ultra-high-risk intervention in a cath lab-while an ordinary OR and immediate conversion capability were unavailable-without disclosing that material change or obtaining renewed, written consent that reflected the altered risks and alternatives.

63. Pre-deprivation process was feasible and required; any emergent circumstances arose only after Defendants elected to proceed in the substandard setting and cannot retroactively cure the lack of pre-deprivation process.

64. The Regents is liable under Monell because the deprivation was caused by policies, customs, practices, or failures to train/supervise that were moving forces behind the violations.

14

65. As a direct and proximate result, Plaintiffs sustained the injuries and damages described, including catastrophic neurological injury to Minor GGM and Parents' harms.

66. Plaintiffs seek compensatory and nominal damages, declaratory relief, and prospective injunctive relief.

67. Additional Procedural Due Process Deprivation (Exclusion/Ban Without Pre-Deprivation Process). Separately and in addition to the foregoing deprivations, Defendants excluded and banned Plaintiff Chris Gaynor-Maioriello  from the hospital on August 16, 2023, based on uninvestigated, second-hand allegations, thereby depriving the Parents of their liberty interest in familial association and participation in Minor GGM's ongoing medical decision-making without notice and a meaningful pre-deprivation opportunity to be heard. No emergency prevented basic pre-deprivation process (such as notice of accusations, an immediate interview, witness corroboration, or a neutral review), and post-hoc law-enforcement involvement and a later criminal dismissal with prejudice cannot retroactively cure the lack of pre-deprivation procedures [see Additional Allegations ¶¶ 45–53].

68. Feasible Safeguards Omitted. Minimal, practicable safeguards—including prompt, contemporaneous investigation, parent interview, corroboration with witnesses or objective evidence, and neutral supervisory review—would have significantly reduced the risk of erroneous deprivation without impairing hospital operations. The failure to provide these safeguards before excluding and banning a parent violated procedural due process under the Mathews balancing framework as pleaded in analogous § 1983 complaints [SRC-1, CTX-118; SRC-1, CTX-132].

69. Monell Liability. The deprivation resulted from policies, customs, or failures to train/supervise that tolerated exclusion or ban of parents from pediatric care areas based on unverified allegations and without defined pre-deprivation procedures, making The Regents liable under Monell.

**COUNT II 42 U.S.C. § 1983 - Substantive Due Process/State-Created Danger (Fourteenth Amendment) (Against All Individual Defendants; Monell Liability Against the Regents)**

70. Plaintiffs incorporate by reference Paragraphs 1-48.

71. Acting under color of state law, Defendants committed affirmative acts that created or increased a specific danger to Minor GGM by selecting a cath lab for an ultra-high-risk PA de-banding knowing an ordinary OR and immediate conversion capability were unavailable, initiating the intervention in that substandard venue, and proceeding without renewed, written parental consent after materially altering the risk profile.

72. The risk of catastrophic hemorrhage/arrest and hypoxic-ischemic brain injury was specific, immediate, and foreseeable to this limited class of patients; Defendants acted with deliberate indifference in circumstances allowing time for deliberation, thereby shocking the conscience.

73. The Regents is liable under Monell for the policies, customs, practices, and failures to train/supervise that were moving forces behind the constitutional deprivation.

74. Defendants' conduct was a moving force and proximate cause of Plaintiffs' injuries. Plaintiffs seek compensatory and nominal damages and injunctive relief.

**COUNT III 42 U.S.C. § 1983 - Interference with Familial Association (First and Fourteenth Amendments) (Against All Individual Defendants; Monell Liability Against the Regents)**

75. Plaintiffs incorporate by reference Paragraphs 1-53.

16

76. The Parents possess a fundamental liberty interest in familial association and in directing their minor child's medical care, including the right to informed, written consent before invasive procedures and material changes in venue/resources/personnel/risk.

77. Defendants interfered with and burdened this right by materially changing the venue and risk profile and proceeding without renewed, written parental consent and without full, accurate disclosure, thereby depriving the Parents of a meaningful opportunity to decide.

78. The Regents' policies, customs, practices, and failures to train/supervise were moving forces behind this deprivation.

79. Defendants' interference caused the injuries alleged. Plaintiffs seek compensatory and nominal damages and injunctive relief.

80. In addition, on August 16, 2023, Defendants—acting through hospital personnel—fabricated misconduct allegations against Plaintiff Chris Gaynor-Maioriello , seized the Gaynor-Maioriello s' infant without parental consent or emergent necessity, summoned law enforcement on the basis of second-hand, uninvestigated assertions, and excluded Mr. Gaynor-Maioriello  from the hospital while Minor GGM remained critically ill, thereby further interfering with familial association and the Parents' ability to be present with and make medical decisions for their child. The temporal proximity to Mr. Gaynor-Maioriello 's expression of intent to pursue legal action supports an inference of retaliatory motive, and the exclusion and ban substantially burdened the Parents' constitutional rights.

**COUNT IV 42 U.S.C. § 1983 - Equal Protection (Fourteenth Amendment) (Against All Individual Defendants; Monell Liability Against the Regents)**

81. Plaintiffs incorporate by reference Paragraphs 1-58.

17

82. Defendants intentionally treated Minor GGM-a medically complex, disabled child-differently than similarly situated pediatric cardiac patients without a rational basis by proceeding in a cath lab without ordinary OR and immediate conversion capability and without renewed, written consent, despite internal recommendations favoring an OR-based approach for similarly situated cases.

83. Alternatively, Defendants acted with disability-based animus or deliberate indifference to federally protected disability rights, and the Regents maintained or tolerated policies/practices causing or perpetuating such discrimination.

84. The unequal treatment was a moving force and proximate cause of Plaintiffs' constitutional injuries. Plaintiffs seek compensatory and nominal damages and injunctive relief.

**COUNT IV-A 42 U.S.C. § 1983 – First Amendment Retaliation (Right to Petition) (Against All Individual Defendants; Monell Liability Against the Regents)**

85. Plaintiffs incorporate by reference Paragraphs 1–62 and 45–53.

86. Protected Activity. Plaintiff Chris Gaynor-Maioriello  engaged in protected First Amendment activity by expressing his intent to pursue legal action and to petition for redress regarding Minor GGM's injuries and Defendants' conduct. This activity relates to matters of public concern and private petitioning and is protected speech and petitioning under the First Amendment. See, e.g., examples of First Amendment retaliation pleadings asserting protected speech and petitioning against Colorado public institutions [SRC-1, CTX-52; SRC-1, CTX-53; SRC-1, CTX-55].

87. Adverse Action. Acting under color of state law, hospital personnel and supervisory decision-makers caused materially adverse actions that would deter a person of ordinary firmness from continuing to engage in protected activity, including: fabricating

18

allegations against Mr. Gaynor-Maioriello ; removing the Gaynor-Maioriello s' infant without parental consent or emergent necessity; summoning law enforcement based on uninvestigated, second-hand assertions; and excluding and banning Mr. Gaynor-Maioriello  from the hospital while Minor GGM remained critically ill, thereby cutting off his access and participation in ongoing medical decision-making [see Additional Allegations ¶¶ 45–53]. Analogous pleadings treat negative evaluations, exclusionary actions, and bans as materially adverse acts supporting retaliation claims [SRC-1, CTX-52; SRC-1, CTX-53; SRC-1, CTX-56–CTX-58].

88. Causal Connection. Temporal proximity between Mr. Gaynor-Maioriello 's protected activity (expressing intent to pursue legal action) and the exclusion/ban, together with pretextual and uncorroborated accusations later disavowed and dismissed with prejudice, plausibly establish that the protected activity was a substantial or motivating factor in the adverse actions [see Additional Allegations ¶¶ 51–52].

89. Lack of Probable Cause/Pretext (Pleading in the Alternative). To the extent probable cause is asserted to justify the adverse actions, Plaintiffs allege pretext: accusations were uninvestigated, contradicted by witnesses and recordings, and culminated in a dismissal with prejudice. Comparable retaliation pleadings proceed notwithstanding asserted justifications where facts plausibly allege pretext and deterrent adverse acts by state actors [SRC-1, CTX-52–CTX-55].

90. Monell. The Regents is liable to the extent that final policymakers ratified the exclusion/ban or maintained policies, customs, or failures to train/supervise that allowed retaliatory exclusion of parents from pediatric units without verified cause, investigation, or pre-deprivation process when parents engage in protected petitioning.

91. Damages and Relief. The retaliatory exclusion and ban caused injury, including interference with First Amendment rights, loss of access to and participation in the child's care, and severe emotional distress. Plaintiffs seek compensatory and nominal damages, punitive damages against individual-capacity defendants, declaratory relief, and appropriate injunctive relief (including policies prohibiting exclusion or ban of parents engaged in protected activity absent verified cause and defined procedural safeguards).

**COUNT V 42 U.S.C. § 1983 - Failure to Intervene and Supervisory Liability (Against Individual Defendants)**

92. Plaintiffs incorporate by reference Paragraphs 1-69.

93. Individual Defendants who were present and aware that the procedure was proceeding in a cath lab without ordinary OR and immediate conversion capability and without renewed, written consent, and who had a realistic opportunity to halt, postpone, require an OR, or secure re-consent but failed to act, are liable for failure to intervene.

94. Supervisory Defendants who directed, authorized, knowingly acquiesced in, or were deliberately indifferent to the unconstitutional course of conduct—including deficient training, supervision, and enforcement—are liable for their own acts and omissions.

95. Defendants' failures were moving forces behind the constitutional deprivations and the injuries alleged. Plaintiffs seek compensatory and nominal damages and appropriate injunctive relief.

**COUNT VI 42 U.S.C. § 1983 - Conspiracy to Deprive Civil Rights (Against Individual Defendants)**

96. Plaintiffs incorporate by reference Paragraphs 1-66.

97. Two or more Defendants, acting under color of state law, agreed and/or reached a meeting of the minds to deprive Plaintiffs of constitutional rights, including bodily

integrity, parental medical decision-making/familial association, due process, and equal protection, by proceeding in a cath lab without ordinary OR availability and immediate conversion capability and without renewed, written parental consent, and by concealing material facts before and after the event.

98. In furtherance, conspirators committed overt acts, including initiating the intervention in the cath lab, omitting re-consent, using misleading partial disclosures, and maintaining documentation/communications that omitted or minimized material facts.

99. The conspiracy was a moving force and proximate cause of Plaintiffs' injuries. Plaintiffs seek compensatory and nominal damages and injunctive relief.

**COUNT VI-A 42 U.S.C. § 1983 – Nonconsensual Human Medical Experimentation/Bodily Integrity (Fourteenth Amendment) (Against All Individual Defendants; Monell Liability Against the Regents)**

100. Plaintiffs incorporate by reference Paragraphs 1–70.

101. Acting under color of state law, Defendants conducted nonconsensual human medical experimentation upon Minor GGM by selecting and initiating an ultra–high-risk pulmonary artery de-banding attempt in an untested catheterization-laboratory setting without ordinary OR availability or immediate surgical conversion capability, and without an IRB-approved protocol or a research-compliant, written, signed informed consent from her Parents.

102. The Constitution protects against nonconsensual governmental experimentation on one's body and secures the fundamental liberty interests in bodily integrity and in parental medical decision-making for a minor child. Courts have recognized that nonconsensual human experimentation by government actors offends due process and the most basic notions of ordered liberty. See Clay v. Martin (recognizing claims grounded in human

experimentation and federal policy responses); Stadt v. Univ. of Rochester (holding the right to be free from non-consensual governmental experimentation clearly established); Estate of Alvarez v. Johns Hopkins Univ. (recognizing the customary international-law prohibition against nonconsensual human medical experiments); Diaz v. Hillsborough Cty. Hosp. Auth. (addressing systemic failures to obtain research consent in a public-hospital setting) [SRC-18, CTX-5; SRC-32, CTX-13; SRC-21, CTX-66; SRC-19, CTX-6].

103.      Elements. Plaintiffs will prove: (a) state action; (b) intentional initiation of a human-subject experiment or a materially experimental departure from accepted therapeutic practice; (c) lack of constitutionally adequate, written, and signed informed consent by the Parents specific to the experimental conduct; and (d) causation of constitutional injury to bodily integrity and to parental decision-making rights. The Regents are liable under Monell because policies, customs, and failures to train/supervise were moving forces behind the experimentation without consent.

104.      Application. Defendants' use of a cath lab for an ultra-high-risk, non-emergent de-banding attempt, in the face of foreseeable catastrophic rupture and absent ordinary OR safeguards, constituted a materially experimental departure from accepted practice. No research-compliant, written parental consent was obtained; no IRB-vetted protocol governed the deviation; and the Parents were not told they could refuse without penalty. Defendants thereby violated clearly established constitutional protections against nonconsensual human experimentation.

105.      Injuries and Relief. The experimentation without consent was a moving force in causing Minor GGM's PA rupture, arrest, and hypoxic-ischemic encephalopathy, and in depriving the Parents of their fundamental rights. Plaintiffs seek compensatory and nominal

damages, punitive damages against individual-capacity Defendants, declaratory relief that nonconsensual human experimentation violates the Constitution, and injunctive relief requiring IRB-level safeguards and research-compliant, written, signed consent for any experimental departures.

**COUNT VII Americans with Disabilities Act, Title II (42 U.S.C. § 12132) (Against the Regents and Official-Capacity Defendants)**

106.　Plaintiffs incorporate by reference Paragraphs 1-70.

107.　The Regents is a "public entity" within Title II. Minor GGM is a qualified individual with a disability who was eligible to receive pediatric cardiac services with or without reasonable modifications.

108.　By reason of disability, Defendants denied Minor GGM equal access to the benefits of a safe, standard operative environment and consent protections, failed to reasonably modify policies, practices, and procedures, failed to ensure effective parental communication, and employed methods of administration that had the effect of denying equal opportunity and screening out disabled children from safer modalities of care.

109.　Defendants acted with deliberate indifference to these rights. Plaintiffs seek compensatory damages against the public entity to the extent permitted, declaratory relief, and prospective injunctive relief.

**COUNT VIII Rehabilitation Act § 504 (29 U.S.C. § 794) (Against Programs Receiving Federal Financial Assistance)**

110.　Plaintiffs incorporate by reference Paragraphs 1-74.

111.　The Regents and its programs receive federal financial assistance. Minor GGM is an individual with a disability who was otherwise qualified to receive the pediatric cardiac services at issue.

112.     Solely by reason of disability, Defendants excluded Minor GGM from equal participation in, denied her the benefits of, and subjected her to discrimination under the program or activity by initiating an ultra-high-risk intervention in a cath lab without ordinary OR and immediate conversion capability and without renewed, written consent, and by failing to reasonably modify policies, practices, and procedures.

113.     Defendants acted with deliberate indifference. Plaintiffs seek compensatory damages, declaratory relief, and prospective injunctive relief.

COUNT IX Medical Battery / Unauthorized Medical Procedure (Common Law) (Against All Individual Defendants; Vicarious Liability Against the Regents)

114.     Plaintiffs incorporate by reference Paragraphs 1-78.

115.     Defendants intentionally made physical contact with Minor GGM by initiating and performing an invasive cardiac intervention.

116.     The contact was without valid consent or exceeded the scope of any consent given because Defendants materially changed the venue, resources, personnel, timing, and risk profile—proceeding in a cath lab without ordinary OR and immediate conversion capability—without obtaining renewed, informed, written parental authorization. Independently and additionally, the contact was nonconsensual because Defendants subjected Minor GGM to a materially experimental application of a cath-lab venue for an ultra–high-risk, non-emergent de-banding attempt without obtaining a research-compliant, written, signed consent from her Parents.

117.     The unauthorized contact caused the injuries alleged. Plaintiffs seek compensatory and, where permitted, punitive damages, and vicarious liability against the Regents for its employees' acts.

118.    COUNT X Lack of Informed Consent (Negligence) (Against All Individual Defendants; Vicarious and Direct Liability Against the Regents)

119.    Plaintiffs incorporate by reference Paragraphs 1-82.

120.    Defendants owed a duty to disclose material information necessary for informed parental decision-making and to obtain renewed, written consent upon material changes. Where a provider departs into experimental methods or research involving human subjects, the duty includes obtaining research-compliant, written, and signed informed consent from the Parents that discloses the experimental nature of the intervention, the purpose and procedures, reasonably foreseeable risks, benefits, and alternatives, and the Parents' right to refuse without penalty.

121.    Defendants breached that duty by failing to disclose, inter alia, that the procedure would occur in a cath lab, that an ordinary OR and immediate conversion capability were unavailable, the materially increased risk profile, prior recommendations favoring an OR-based approach, and reasonable alternatives; and by failing to obtain renewed, written consent. Defendants further breached their duty by initiating a materially experimental application of a cath-lab venue to an ultra–high-risk, non-emergent de-banding attempt without obtaining any research-compliant, written, signed consent specific to experimental conduct from the Parents.

122.    A reasonable parent—and these Parents—would not have consented had the material facts been disclosed, including the experimental nature of the venue/method. The breach proximately caused the injuries alleged. Plaintiffs seek compensatory damages and vicarious/direct liability against the Regents.

COUNT XI Professional Negligence / Medical Malpractice (Against All Individual Defendants; Vicarious and Direct Liability Against the Regents)

123.     Plaintiffs incorporate by reference Paragraphs 1-86.

124.     Defendants owed duties consistent with the applicable standards of care in pediatric interventional cardiology, pediatric cardiology, cardiothoracic surgery, anesthesia/critical care, and perioperative nursing/ECMO.

125.     Defendants breached those duties by, inter alia, selecting a catheter-based approach and a cath-lab venue without ordinary OR and immediate conversion capability, failing to postpone or convert to an OR-based approach, failing to obtain operative records or account for uncertainty, failing to re-consent, and inadequately preparing for catastrophic hemorrhage/arrest.

126.     The breaches were substantial factors in causing the injuries alleged. Plaintiffs seek compensatory damages and vicarious liability against the Regents, as well as direct institutional negligence where applicable.

**COUNT XII Negligent Hiring, Training, Supervision, and Retention (Against the Regents)**

127.     Plaintiffs incorporate by reference Paragraphs 1-90.

128.     The Regents owed duties to exercise reasonable care in hiring, credentialing, privileging, training, supervising, retaining, and disciplining clinical personnel, and to implement/enforce policies for site selection, escalation/deferral, and re-consent.

129.     The Regents breached these duties by failing to require OR availability and immediate conversion capability for ultra-high-risk pediatric interventions; failing to

26

adopt and enforce re-consent protocols for material changes; tolerating proceeding in substandard venues; and retaining personnel despite unsafe decision-making.

130.    The Regents' breaches were substantial factors in causing the injuries alleged. Plaintiffs seek compensatory damages.

**COUNT XIII Negligent Misrepresentation by Omission (Against All Individual Defendants; Vicarious and Direct Liability Against the Regents)**

131.    Plaintiffs incorporate by reference Paragraphs 1-94.

132.    In supplying information for parental decision-making, Defendants owed a duty to exercise reasonable care to disclose material facts.

133.    Defendants breached that duty by omitting material facts and providing misleading partial disclosures (e.g., generic "surgical standby") without disclosing the OR's unavailability, lack of immediate conversion capability, and materially greater risk, and by failing to obtain renewed, written consent.

134.    Plaintiffs justifiably relied on Defendants' omissions. The omissions were substantial factors in causing the injuries alleged. Plaintiffs seek compensatory damages and vicarious/direct liability against the Regents.

**COUNT XIV Fraudulent Concealment (Against All Individual Defendants; Vicarious and Direct Liability Against the Regents)**

135.    Plaintiffs incorporate by reference Paragraphs 1-98.

136.    Defendants, having a duty to speak, concealed or failed to disclose material facts, including the cath-lab venue, the OR's unavailability, lack of immediate conversion capability, materially heightened risks, prior recommendations, and reasonable alternatives, intending Plaintiffs to rely on the false impression created.

137. Plaintiffs reasonably relied, authorizing care under false pretenses and refraining from timely action. The concealment caused the injuries alleged and supports tolling. Plaintiffs seek compensatory and punitive damages where permitted, and vicarious/direct liability against the Regents.

**COUNT XV Civil Conspiracy (Common Law) (Against All Individual Defendants; Vicarious Liability Against the Regents)**

138. Plaintiffs incorporate by reference Paragraphs 1-101.

139. Defendants combined by agreement or understanding to accomplish an unlawful objective or a lawful objective by unlawful means, including proceeding in a cath lab without ordinary OR availability and immediate conversion capability, omitting renewed, written consent, and concealing material facts.

140. Overt unlawful acts in furtherance included the initiation of the intervention in the cath lab, the omission of re-consent, misleading partial disclosures, and documentation/communication practices that concealed material facts.

141. The conspiracy proximately caused Plaintiffs' injuries. Plaintiffs seek compensatory and punitive damages where permitted, and vicarious liability against the Regents.

**COUNT XVI Outrageous Conduct / Intentional Infliction of Emotional Distress (Against All Individual Defendants; Vicarious Liability Against the Regents)**

142. Plaintiffs incorporate by reference Paragraphs 1-105.

143. Defendants' conduct-proceeding with an ultra-high-risk pediatric intervention in a cath lab without ordinary OR and immediate conversion capability, without renewed, written consent, and with concealment of material facts-was extreme and outrageous,

undertaken intentionally or recklessly, and caused severe emotional distress to Minor GGM and to her Parents.

144.     Plaintiffs seek compensatory and punitive damages where permitted, and vicarious liability against the Regents.

**COUNT XVII Breach of Fiduciary Duty (Against All Individual Defendants; Vicarious and Direct Liability Against the Regents)**

145.     Plaintiffs incorporate by reference Paragraphs 1-108.

146.     Defendants owed fiduciary duties of loyalty, candor, full disclosure, and utmost good faith to Minor GGM and to her Parents during decision-making.

147.     Defendants breached those duties by materially changing venue/resources/personnel/risk without renewed, written consent; by providing misleading partial disclosures; by deviating from safer alternatives; and by concealing material facts.

148.     The breaches caused the injuries alleged. Plaintiffs seek compensatory and punitive damages where permitted, and vicarious/direct liability against the Regents.

**COUNT XVIII Negligent Infliction of Emotional Distress (Parents' Claims) (Against All Individual Defendants; Vicarious Liability Against the Regents)**

149.     Plaintiffs incorporate by reference Paragraphs 1-112.

150.     Defendants' negligence created an unreasonable risk of serious physical harm to Minor GGM that the Parents contemporaneously perceived or were immediately made aware of, producing severe emotional distress with physical manifestations or long-continued emotional disturbance.

151.     Defendants' negligence was a substantial factor in causing the Parents' severe emotional distress. Plaintiffs seek compensatory damages and vicarious liability against the Regents.

**COUNT XIX Declaratory and Injunctive Relief (Against Official-Capacity Defendants)**

152.     Plaintiffs incorporate by reference Paragraphs 1-115.

153.     Plaintiffs seek a declaration that Defendants' acts, omissions, policies, customs, and practices violate the Constitution, § 1983, Title II of the ADA, and § 504 of the Rehabilitation Act.

154.     Plaintiffs seek a permanent injunction requiring, inter alia: (a) mandatory ordinary OR availability and immediate surgical conversion capability for ultra-high-risk pediatric cardiac interventions; (b) mandatory renewed, written parental re-consent for any material change in venue/resources/personnel/risk; (c) escalation/deferral criteria; (d) adherence to multidisciplinary recommendations or documented, disclosed deviations; (e) documentation and transparency reforms; (f) training and competency; (g) auditing, reporting, and corrective action; (h) disability-related modifications and equal-access measures; (i) independent compliance oversight; and (j) record preservation and parent-notification measures.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against all Defendants, jointly and severally where permitted, and award:

A. Declaratory relief consistent with Count XIX;

B. Prospective injunctive relief requiring the policies, training, supervision, documentation, escalation/deferral criteria, re-consent protocols, equal-access/disability-related modifications, and IRB-level safeguards for any experimental departures from accepted practice, including research-compliant, written, and signed parental consent that expressly discloses any experimental purpose, procedures, risks, benefits, and alternatives;

C. Compensatory damages (economic), including past and future medical care, therapies, durable medical equipment, supplies, home health/attendant care, nursing, respiratory/nutritional support, transportation, home/vehicle modifications, special education/habilitation, case management, and all life-care plan components, and the Parents' individual economic losses as permitted;

D. Compensatory damages (non-economic), including pain and suffering, emotional distress, loss of enjoyment of life, and damages for physical impairment and disfigurement for Minor GGM, and the Parents' individual non-economic damages as allowed by law;

E. Special and consequential damages, including guardianship/conservatorship costs and protective arrangements as proven;

F. Nominal damages on civil-rights claims as appropriate;

G. Punitive/exemplary damages against individual-capacity Defendants where permitted by law;

H. Attorney's fees and litigation expenses pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a(b), and taxable costs under Fed. R. Civ. P. 54(d)(1);

I. Pre-judgment and post-judgment interest as allowed by law; and

J. Such other and further relief, legal or equitable, as the Court deems just and proper.

DATED: April 22, 2026.

Respectfully submitted,

/s/Joseph A. Whitcomb

Joseph A. Whitcomb, Co. Bar # 39742
Whitcomb, Selinsky, PC
300 Union Blvd., Suite 200
Lakewood, CO 80228
(303)534-1958 office (303)573-5461 direct